JEFFERY ET AL., TRUSTEES, *v.* JOHNSON ET AL., COUNTY COMMRS., ET AL.

[Cite as Jeffery v. Johnson (1970), 23 Ohio Misc. 338.]

(No. 20087—Decided May 26, 1970.)

Common Pleas Court of Paulding County.

*Mr. Russell J. McMaster,* prosecuting attorney, for plaintiffs.

*Mr. Roy S. Johnson* et al., defendants, *in propria persona.*

HITCHCOCK, J. Plaintiffs are the trustees of the Paulding County Hospital. Defendants are the Commissioners, the Auditor, and the Treasurer of Paulding County, Ohio. All defendants have waived service of summons and entered their appearance. All parties stipulate that there is no issue as to the facts stated in the petition, that it is a real concern of the plaintiffs to provide hospital professional liability insurance protection for their employees as they have done pursuant to their interpretation of R. C. 339.06, and that all parties are agreed the court shall hear the matter upon the merits and render a declaratory judgment on the petition, including a writ of mandamus against the commissioners if that appears lawful and proper.

Plaintiffs, acting under their understanding of R. C. 339.06, in 1967 designated for purchase and referred to the Board of County Commissioners for payment a certain insurance policy issued by The Buckeye Union Insurance Company, No. CLA 1988 55, a renewal of No. CL 28903, policy period June 2, 1967 to 1970, and known as a hospital professional liability policy. The limits of liability are $50,000 for each personal injury claim and an aggregate of $150,000 and as to property damage $5,000 and $25,000, respectively, and the premiums therefor have been paid.

Plaintiffs have requested that the commissioners pay the premium for a renewal of the policy but the commissioners refuse to do so, saying they have not the authority to pay therefor. The auditor and treasurer need to know what is lawful in the circumstances.

The policy in question, a copy of which is Exhibit A to the petition, contains two lines reading as follows:

"If this policy is written for a period of three years the net premium for three years shall be $4,732.00.

"Payable: In Advance $1,628.00    1st Anniversary $1,552.00    2d Anniversary $1,552.00."

Certain other provisions of the policy read as follows:

"*Item 1.   Named Insured* and Address:

"Trustees of Paulding County Hospital and the Commissioners of Paulding County, Ohio, as respects their liability arising from operations of trustees of Paulding County Hospital, S/E corner of state routes 500 and 111, Paulding Township, Paulding Co., Ohio.

"*Item 2.*   Policy Period

"From June 2, 1967 to June 2, 1970 12:01 A. M., standard time at the address of the *named insured* as stated herein.

"* * * *

"Business of the *named insured* is: Hospital—not for profit.

"*Item 3.*   The insurance afforded is only with respect to the following Coverage Part(s) indicated by specific premium change(s).   (only pertinent items included.)

"Annual    Coverage         Coverage  Part(s)
"Advance  Part No(s).
"Premiums
"$  287.31    6102    Comprehensive General Liability Insurance
"  1,326.00    6124    Hospital Professional Liability Insurance
"$1,613.31    *Total Annual Advance Premium for this policy.*

"* * *.

"Coverage Part
"1.   Coverage O—Hospital Professional Liability
"The company will pay on behalf of the *insured* all sums which the *insured* shall become legally obligated to pay as *damages* because of injury to any person arising out of the rendering of or failure to render, during the policy period, the following professional services:

"(a)   medical, surgical, dental or nursing treatment to such person or the person inflicting the injury including the furnishing of *food* or *beverages* in connection therewith.

"(b)   furnishing or dispensing of drugs or medical, dental or surgical supplies or appliances if the injury occurs after the *named insured* has relinquished possession thereof to others.

"(c)   handling of or performing post-mortem examinations on human bodies, or

"(d)   service by any person as a member of a formal accreditation or similar professional board or committee of the *named insured,* or as a person charged with the duty of executing directives of any such board or committee, and the company shall have the right and duty to defend any suit against the *insured* seeking such *damages,* even if any of the allegations of the suit are groundless, false or fraudulent, and may make such investigation and, with the written consent of the *insured,* such settlement of any claim or suit as it deems expedient, but the company shall not be obligated to pay any claim or judgment or to defend any suit after the applicable limit of the company's liabil-

ity has been exhausted by payment of judgments or settlements."

The court, being of the opinion that the uncontroverted facts stated in the petition were not sufficiently complete for a proper resolution of this matter, directed certain interrogatories to the Board of County Commissioners, Board of Hospital Trustees, the Administrator of the hospital, and the insurance agency writing the policy.

The interrogatories and answers having relevance in this cause are as follows:

I. The Board of County Commissioners

1. Who are the members of the board and what is the date when each first began as a member of the board?

Answer: 1. Willis Stoller—January 1, 1969.
2. Charles H. Cunningham—January 1, 1967.
3. Roy S. Johnson—January 1, 1961.

2. Does any member have any recollection of any objection by anyone (other than the State Examiner who made his report about January 1, 1969) to the hospital professional liability insurance program evidenced by the policy appearing as Exhibit "A" to the petition?

Answer: No.

3. If answer to Number 2 is "yes," explain fully.

4. Have members of the Board of County Commissioners heretofore approved payment for the premium necessary to pay for the policy of which Exhibit "A" to the petition is a copy?

Answer: No.

5. If answer to Number 4 is "yes," for how long to the knowledge of at least one member?

6. Does any member of the Board of County Commissioners have any reason for disapproving payment of the present premium now due on the policy of which Exhibit "A" to the petition is a copy, other than doubt of legality created by the report of the State Examiner?

Answer: No.

7. If answer to Number 6 is "yes," explain fully.

## II. The Hospital Trustees

1. Who are the members of the Board of Hospital Trustees and what is the date when each first began as a member?

Answer:
1. Merle Jeffery, Jan., 1955.
2. Rex Gauvey, Sept., 1959.
3. Gerald Kohart, May, 1967.
4. George Slade, May, 1963.
5. Oscar Laukhuf, Feb., 1961.
6. Robert Simpson, March, 1970.

2. Does any member have any recollection of any objection by anyone (other than the state examiner who made his report about January 1, 1969) to the hospital professional liability insurance program evidenced by the policy appearing as Exhibit A to the petition?

Answer: No.

3. Does any member recall a time when this insurance protection was not provided to the Paulding County Hospital?

Answer: No.

4. If yes, give details.

5. Has provision for paying the premium for this policy of which Exhibit "A" to the petition is a copy, and other similar previous policies, always been included in the annual budget during the time any present member of the board has been a member?

Answer: Yes.

6. If no, explain fully.

7. What, in the opinion of the present members of the Board of Hospital Trustees, has heretofore been the chief reason or reasons why this insurance evidenced by the policy of which Exhibit "A" is a copy has been provided?

Answer: For employee protection.

8. Do the members of the Board of Hospital Trustees desire that this protection continue to be provided?

Answer: Yes.

9. What do you consider important reasons for main-

taining the present hospital professional liability insurance program in the future?

Answer: This insurance protection is very necessary for peace of mind of the employees and the general well being of the patients.

III. R. E. Gorman Insurance Agency, Inc.

1. What is your name and official position with the R. E. Gorman Insurance Agency?

Answer: R. E. Gorman, President of R. E. Gorman Insurance Agency, Inc.

2. Did your company write Buckeye Union Insurance Company policy No. CLA 19 88 55 providing comprehensive General Liability Insurance and Hospital Professional Liability Insurance for the period of June 2, 1967, to June 2, 1970, for the trustees of Paulding County Hospital and the commissioners of Paulding County, Ohio, as respects their liability arising from operations of trustees of Paulding County Hospital?

Answer: Yes.

3. How did this policy come to be issued?

Answer: As a renewal to Pol. No. CL 29803.

4. How long has the Paulding County Hospital provided this kind of insurance coverage?

Answer: My office records show this coverage since 1948.

5. During this period have any claims been asserted under this coverage?

Answer: Yes.

6. If any, how many?

Answer: Eight.

7. How many claims involved acts of individual employees which were claimed to amount to negligence or to be otherwise wrongful?

Answer: Five.

8. How many of these claims, if any, involved official acts of either members of the Board of Hospital Trustees or members of the Board of County Commissioners?

Answer: One.

9. How many of these claims, if any, involved acts of physicians or registered nurses?

Answer: Two.

10. In how many of these total claims were settlements effected?

Answer: Five and one claim pending.

11. Does your company, The Buckeye Union Insurance Company, concede that the policy covers negligent and other wrongful acts of all hospital employees in their individual capacity, while acting within the scope of their employment?

Answer: No—But subject to its terms the policy covers the liability of the named insured for the negligent acts of all hospital employees.

12. As to acts of the individual members of the Board of County Commissioners, the Board of Hospital Trustees, and the Administrator of the Paulding County Hospital, done in their official capacity in connection with the hospital, which might result in injury to others, is it your understanding that your company, The Buckeye Union Insurance Company, to the extent of the limits of liability set out in the policy of which Exhibit "A" to the petition is a copy, waives any defense which might be asserted in their behalf as representatives of the state of Ohio?

Answer: The policy has not been endorsed so as to waive defense.

13. Is liability insurance in respect to their work commonly and easily available to all hospital employees?

Answer: No.

14. During all years known to you in which the current and prior policies have been in force, do you know of any complaint by anyone, that the coverage was unnecessary, unlawful, or not desired by the hospital trustees, employees and patients?

Answer: Yes, in January 1969.

15. What is your understanding of the chief reason or reasons the Board of Hospital Trustees have purchased the policy designated Exhibit "A" in these proceedings?

Answer: The Board of Trustees wanted protection from liability for themselves, their employees and hospital patients.

IV. Richard W. Crowell, Administrator of the
Paulding County Hospital

1. How long have you been Administrator of Paulding County Hospital?

Answer: 8½ years.

2. When you became administrator was there in force a hospital professional liability insurance policy similar to the one of which, Exhibit "A" to the petition is a copy?

Answer: Yes.

3. When did you first learn of this insurance program?

Answer: When I started employment.

4. Do you know for how long a similar insurance program has been provided in respect to Paulding County Hospital?

Answer: I have been told it was in effect in the 1940's.

5. If answer to number 4 is yes, state period of time?

Answer: 25 years.

6. Has there been any disagreement, as a matter of managerial judgment, between yourself and any member of the Board of Hospital Trustees, past or present, in respect to the desirability of providing this program at the Paulding County Hospital?

Answer: No.

7. In your judgment as administrator of the hospital for the members of the Board of Hospital Trustees, who are charged with the management of the hospital, are there good reasons this insurance has been provided in the past and should be provided in the future?

Answer: Yes.

8. If your answer to Number 7 is yes, explain fully.

Answer: I have been told by the laboratory technicians if without this protection they would resign. It is my understanding that under present Ohio law there are

a number of acts which hospital employees might do in performance of their duties in which they would be held liable and the hospital would be immune from suit. If this is so this protection is necessary for the peace of mind of our employees and also the patients.

9. During the calendar year 1969 how many full time employees did the Paulding County Hospital have in the following categories: (1) interns and residents; (2) registered nurses; (3) licensed practical nurses; (4) nurses aides; (5) hospital orderlies; (6) laboratory technicians; (7) dieticians, cooks and other kitchen help; (8) business office personnel; (9) maintenance and custodial employees; (10) other employees not fitting any classification listed above?

Answer:   (1)  none
           (2)  33
           (3)  40
           (4)  20
           (5)   1
           (6)   3
           (7)  18
           (8)   5
           (9)   6
         (10)   6

10. During the calendar year 1969 how many different individuals were called upon for part time work of any kind, who were paid for such work as they performed?

Answer: 19

11. During the calendar year 1969 how many persons performed volunteer service for the hospital, on the hospital premises?

Answer: 25

A state examiner for the Bureau of Inspection and Supervision of Public Offices, upon completion of his 1968 audit of the hospital records, made a finding that the payment of mentioned premium was an illegal expenditure, resulting in the filing of the petition herein on December 2, 1969.

348

Consequently, the question for decision is: "May the board of hospital trustees for a county hospital designate for purchase a hospital professional liability insurance policy and require the county commissioners to pay therefor?" The court answers this question, "Yes," for reasons hereinafter set out.

There can be no doubt that Ohio counties and county agencies have, since 1857,[1] enjoyed as integral parts of the sovereign state of Ohio, immunity from suit in court in actions for damages generally.[2] As stated in the syllabus

---

[1]*Board of Commissioners* v. *Mighels* (1857), 7 Ohio St. 109, overruling a precedent of 30 years duration, first laid down in Ohio, as a general rule of law, that counties enjoyed the benefit of sovereign immunity. In 1912, there was added to Section 16, Article I, Ohio Constitution, these words, "Suits may be brought against the state, in such courts and in such manner as may be provided by law." It seems always to have been assumed that "provided by law" means "provided by the Legislature" although, in light of prior Ohio history, this assumption may not necessarily be correct.

[2]The *Mighels case* overruled *Commissioners of Brown Co.* v. *Butt* (1826), 2 Ohio 348, holding that county, as represented by commissioners who had not provided a jail as required by law, was liable for not supplying jail without reference to degree of negligence, in a case where judgment was entered against a sheriff for permitting the escape of a prisoner confined for debt and the sheriff sought indemnity in court from the county. At page 353 the court said,

"The injury has been sustained in consequence of a neglect of duty on the part of the commissioners, not as individuals, but in their corporate capacity as the representatives of the county of Brown."

A dissent insisted the commissioners voluntarily accepted their trust and if by their illegal conduct injury was occasioned they should be personally responsible. Also, there was no statute on the subject and at p. 358 we find: "* * * under our territorial government, a statute was adopted by the governor and judges, in August 1792, declaring the counties liable for escapes that should happen through the insufficiency of the jail. The act pointed out the manner in which the money should be assessed and paid, and also the mode of commencing and conducting suits for the recovery thereof, in case the courts should not order it assessed and paid. The frauds that were practiced on the counties under the law, by collusions between plaintiffs and defendants, when no debts were really due and when defendants were utterly insolvent, became so apparent and oppressive, that the first territorial Legislature, in 1799, repealed the act, and no subsequent Legislature has seen proper to revive it."

to *Schaffer* v. *Board of Trustees of Franklin County Veterans Memorial* (1960), 171 Ohio St. 228; which reversed the Court of Appeals decision (1959) reported in 82 Ohio Law Abs. 571, the general Ohio rule is, "In the absence of statutory authorization therefor, a county or its agencies are immune from suit for negligence."

In 1963 the Court of Appeals for Cuyahoga County held specifically in the syllabus:

"A board of county hospital trustees appointed under Section 339.02, Revised Code, is not liable in its quasi corporate capacity, nor are the trustees individually liable when no malice or corruption is imputed, by statute or at common law, in an action for damages for injury resulting to a hospital patient by negligence in the discharge of its or their official functions; nor are either vicariously liable for the negligence of their servants or employees." *Wierzbicki, Exrx.*, v. *Carmichael,* 118 Ohio App. 239, 91 Ohio Law Abs. 220.

This *Wierzbicki case,* however, did not disclose that the hospital had any liability insurance, nor did it indicate that it had any obligation to provide any under Ohio law. This case requires me to determine whether or not our statutes authorize boards of county hospital trustees to purchase a policy of hospital professional liability insurance for the benefit of all hospital employees and hospital patients, in such amount as the board members deem reasonable and proper, and thereby waive sovereign immunity as a defense to actions for damages within the limits of the pro-

---

Although both the original drafts of the Ohio Constitution of 1802 and 1851 were silent on the subject, the rule in this *Butt case* remained the law of Ohio until 1857 when it was overruled to set asde the $7,750.00 judgment entered against Hamilton County on the verdict of a jury for a person whose "thigh and two ribs were * * * fractured and broken" and whose petition asked $10,000. Plaintiff suffered injuries by reason of being summoned as a witness to testify in a criminal trial being held in the Hamilton County Court House and being required to remain until after nightfall and before leaving falling into an invisible, unlighted, unguarded hole located under a court house stair, and leading to the cellar.

tection provided by such policy. An examination of our statutes will show that they do.[3]

R. C. 339.06, as now in effect and as it has been since November 21, 1967, entitled, "Operation of hospital by trustees; administrator," in pertinent part, now reads: " * * *

"The board of county hospital trustees shall have the entire management and control of the hospital.

---

[3]This decision is made with full knowledge of the comment by Ronald E. Schultz entitled, "Ohio Sovereign Immunity: Long Live the King" (1967), 28 O. S. L. J. 75, and the cases therein cited and discussed. Mr. Schultz after considering the precedents, proposes that it would be well for Ohio to abolish sovereign immunity in respect to its contracts. At page 85 the author says: "* ** In short, the Ohio courts have taken a very narrow view of what constitutes consent to suit. The state may only be sued in accordance with legislation which clearly expresses the state's consent to suit.

"Consent to suit has been granted in piecemeal fashion in Ohio. These consent-to-suit statutes are scattered throughout the Code. (Here reference is made to footnote 76 wherein is found a listing of 16 consent-to-suit sections from the Ohio Revised Code which the author says is "fairly complete.") Noticeably absent from any listing of statutes in which the General Assembly has given consent to suit is any provision for suit against the state on its contracts or for its torts."

At page 88 the author remarks:

"With the increase of government contact with the individual, sovereign immunity has been increasingly questioned. Courts and legislatures have been quicker to do away with immunity from suit in contract than in tort. By the turn of the century several states and the federal government had already given up their immunity from suit on their contracts. This is a step long overdue in Ohio. There is good reason for a state to be more willing to surrender its immunity in contract than in tort.

"A tort is usually an accidental relationship. Frequently the parties having nothing more in common than the fact that they ran their vehicles together in an intersection. The number of torts for which a state could be held responsible is not predictable. Consequently, the demands on the treasury are not foreseeable. It is this uncertainty which is the cause of the General Assembly's reluctance to do away with its sovereign immunity."

The interpretation made here creates no uncertain liabilities against either the state or any county thereof. Neither does it require that the county rent its facilities to a non-profit corporation, as the court understands some counties have done, in order that the insurance protection requested here may be provided.

"* * *

"The board * * * has control of * * * all funds used in its operation. The board * * * shall deposit all moneys received from the operation of the hospital or appropriated for its operation by the board of county commissioners, or resulting from special levies submitted by the board of county commissioners as provided for in Section 5705.22 of the Revised Code, to its credit in banks or trust companies designated by it, which fund shall be known as the hospital operating fund.

"* * *

"The board * * * shall not expend such funds until its budget for that calendar year is submitted to and approved by the board of county commissioners. Thereafter such funds may be disbursed by the board * * * for the uses and purposes of such hospital, * * * on a voucher signed by the administrator, provided for in this section, regularly approved by the board * * * and signed by two members. * * * All moneys appropriated by the board of county commissioners for the operation of the hospital, when collected shall be paid to the board of county hospital trustees on a warrant of the county auditor and approved by the board of county commissioners.

"The board * * * shall employ an administrator, and, upon the nomination by such administrator, shall confirm the employment of such physicians, nurses, and other employees as are necessary to the proper care, control, and management of such hospital and its patients, and the board of county hospital trustees shall fix their respective salaries and compensation. Any person, including the administrator, may be removed by the board * * * at any time when the welfare of such institution warrants removal. The administrator and such other employees as the board * * * deems necessary shall be bonded in amounts established by the board of county hospital trustees, the expenses of which shall be paid out of the hospital operating funds.

"* * *

"The board of county hospital trustees may designate the amounts and forms of insurance protection to be pro-

vided, and the board of county commissioners shall secure such protection.

"* * *"

The Ohio General Assembly since 1908 has made statutory provisions for county hospitals: See 99 Ohio Laws (abbreviated O. L.) 486; 108 O. L., Part 1, 255; 118 O. L. 430; 124 O. L. 705; 125 O. L. 301; 126 O. L. 68; 128 O. L. 737; 132 O. L. S219; 132 O. L. S321. This legislation has invariably provided that county boards of hospital trustees shall have the "entire management and control of said hospital," as does R. C. 339.06, presently in force.

A search of Words and Phrases reveals no judicial definition for the words "entire management" in respect to any enterprise, public or private. Consequently, I must interpret them in their commonly understood meaning.

Turning to The Reader's Digest Great Encyclopedia Dictionary, 3d Ed., 1969, I find after "entire" the meanings: "Having no part missing; whole, complete," and "Not lessened nor impaired; full; total," among the several listed for the adjective, reflecting the sense of the word as used in the statute, and as long understood in the English language. After the noun, management, the same source lists these four meanings: "1. The act, art, or practice of managing; administration.  2. The person or persons who manage a business, institution, etc.; the administration.  3. Managers collectively, especially in their relations with labor unions.  4. The skillful use of means; ingenuity."

The present Paulding County Hospital building was newly erected in 1961 and opened its doors in February 1962.  It was added to in 1968 and is now a small, sixty-five bed, modern hospital, so exceptionally well equipped that leading surgeons from sizable cities commonly visit it to practice their vocation.  It receives the proceeds of a special tax levy voted by the people of this county and is a recipient of substantial donations derived from the continuous efforts of an effective local benevolent society.  It is certainly an institution in which nearly every resident of this county takes considerable pride and will do much to defend, support and uphold.

In 1951, the Ohio Legislature introduced a new paragraph into Section 3137, General Code (the substance of which is retained in R. C. 339.06, see *supra*) reading:

"The trustees shall have the privilege of designating the amounts and forms of insurance to be provided, and it shall be incumbent upon the county commissioners to secure such protection."

The present language in R. C. 339.06 was first adopted, effective October 13, 1953. It is noted that the present statute states that the "board * * * may designate" when the 1951 act said the "trustees shall have the privilege of designating," so that the act has always been permissive, and in light of the exercise of the board's "entire management" of the hospital, I am unable to understand how permission could be more clearly granted or authorized.

The present statute reads "insurance protection" when the 1951 act said only "insurance." If there is any difference in meaning it seems certain that the present words "insurance protection" are naturally broader and more inclusive than the word "insurance," standing alone. Still "The World Book Encyclopedia," 1957 edition, commonly used in our schools, says of Insurance: "Insurance is a means of protection against money loss from many kinds of hazards," and in discussion lists these types of insurance, all of which must have been well known to our Ohio legislators in 1951 and since:

Life Insurance
Accident and Health Insurance
Hospital Expenses
Surgical Expenses
Medical Expenses
Major Medical Expenses
Disability Income Insurance
Automobile Insurance
Aviation Insurance
Boiler and Machinery Insurance
Burglary, Theft, Larceny and Robbery Insurance
Credit Insurance
Fidelity, Forgery and Surety Bonds
Glass Insurance

Public Liability, or Personal Liability Insurance
Professional Liability Insurance
Title Insurance
Workmen's Compensation Insurance
Fire Insurance
Marine Insurance
Government Insurance

No doubt this list is not exhaustive but surely our children who read this in school, as well as our adult citizens, are entitled to believe that the word "insurance," when used in a statute by our legislators, includes them all unless some are, by name, excluded. I find the board of hospital trustees, the hospital employees, and hospital patients no less entitled to the plain meaning of this common word "insurance."

Consequently, under the statute the board of hospital trustees has full discretion to designate or not designate the amounts and forms of insurance protection to be provided subject to no limitation other than that the full implication of the statute requires that the insurance protection designated have some real relation to hospital management.

A reading of the excellent and comprehensive article by Crawford Morris, Esq. (one of Cleveland's great present day trial lawyers) entitled: "Response to Ribicoff: Malpractice Suits v. Patient Care" (April 1970), 37 Insurance Counsel Journal 206, surely demonstrates the importance of this type of insurance to practitioners of the healing arts. Also, he recounts recent developments within and without Ohio, saying at page 207:

"Common law dynamics to serve a dynamic age: In 1956 the Supreme Court of Ohio in *Avellone* v. *St. John's Hospital*, 165 Ohio St. 467, 135 N. E. 2d 410, abolished a doctrine which had prevailed for over 50 years * * * (that a non-profit hospital is not liable for the torts of its servants) saying:
"'* * *

"'* * * Whatever the reason for the public policy that gave rise to the rule of immunity, *public policy today, ex-*

*amined in the light of present day conditions, will not support such a rule.''* (Emphasis added.)

How the Paulding County Hospital trustees came to purchase this hospital professional liability insurance so long ago and to maintain it through the years is not known. There is some speculation that it seems likely that two late brother physicians, Drs. Justus and Ray Mouser, prominent in the practice of medicine here during the 1940's and 1950's, insisted upon it and probably regarded its purchase as a proper part of the ''entire management'' of a hospital.

And, although this idea may have properly been held debatable prior to 1951, the statutory change of that year certainly provided explicit authorization for the purchase of such a policy. And if the trustees may lawfully cause the purchase of such a policy, then certainly licensed insurance companies may provide them.

Consequently, I hold that R. C. 339.06 clearly authorizes boards of county hospital trustees to designate for purchase such policies of hospital professional liability insurance, and in such amounts, as they in their discretion determine expedient for their particular hospital, although they have no obligation to do so. When such designation is made, boards of county commissioners are mandated to provide payment therefor. This is evidenced by use of the statutory words ''shall secure such protection.'' I hold further that when such insurance protection is provided, there arises by necessary implication from this authorized action, a waiver of sovereign immunity by the state in the person of a county hospital, to the extent only of the limits of coverage provided by the policy or policies in question. Moreover, by accepting the premium for such protection, insurers waive to a like extent, any defense against recovery based upon sovereign immunity.

For me, this interpretation of the present Ohio law follows the rule of the second paragraph to the syllabus of the Supreme Court of Ohio, in *Slingluff* v. *Weaver* (1902), 66 Ohio St. 621, often followed and never overruled, reading:

''But the intent of the law-makers is to be sought first

of all in the language employed, and if the words be free from ambiguity and doubt, and express plainly, clearly and distinctly, the sense of the law making body, there is no occasion to resort to other means of interpretation. The question is not what did the general assembly intend to enact, but what is the meaning of that which it did enact. That body should be held to mean what it has plainly expressed, and hence no room is left for construction."

With deference to the following Opinions of the Attorney General of Ohio, to wit: 1969 O. A. G. No. 69-085; 1966 O. A. G. No. 66-157; 1962 O. A. G. No. 3139; and 1954 O. A. G. No. 4566—they are disapproved insofar as they may appear to conflict with this opinion. 1952 O. A. G. No. 1126 is approved.

The statutes in respect to the Ohio State University Hospital are in no way similar to those in respect to county hospitals. Consequently *Wolf* v. *Ohio State University Hospital* (1959), 170 Ohio St. 49, has no application to this cause.

Does the subject policy of hospital liability insurance have a definite relation to hospital management? How can it be otherwise when since 1948 there have been eight claims made, of which one is pending, five have been settled, and two have been rejected.

Moreover, the board of hospital trustees states that in the past the chief reason they have provided this insurance is "for employee protection"; and that important reasons for continuing the program "are necessary for the peace of mind of the employees and the general well being of the patients."

Also, the hospital administrator states that: "I have been told by the laboratory technicians if without this protection they would resign. It is my understanding that under the present Ohio law there are a number of acts which hospital employees might do in performance of their duties in which they would be held liable and the hospital would be immune from suit. If this is so this protection is necessary for the peace of mind of our employees and also the patients."

In Ohio it seems clear that employees are generally

held primarily accountable, at the suit of third persons, for injury resulting from their torts, even though committed within the scope of their employment. See 36 Ohio Jurisprudence 2d, Master and Servant, Sections 378, 379, and 416.

In 2 Restatement of the Law of Agency, 1958, it is stated at page 125:

"Section 354. Agent's Negligent Failure After Undertaking Protection of Others

"An agent who, by principal or otherwise, undertakes to act for his principal under such circumstances that some action is necessary for the protection of the person or tangible things of another, is subject to liability to the other for physical harm to him or to his things caused by the reliance of the principal or other upon his undertaking and his subsequent unexcused failure to act, if such failure creates an unreasonable risk of harm to him and the agent should so realize."

And at page 128 it is written:
"* * *

"Illustrations:

"3. A is employed by the government as a coast guardsman with a function of rescuing mariners in distress. T's boat is in danger, and word is sent to A, who negligently fails to respond and does not save T as he could have done if he had performed his duty to the government. A is liable for causing T's death whether or not the government had a duty to aid or had an immunity for liability * * *"

The appendix to the foregoing Section 354 of the Restatement indicates that the principle enunciated, although doubtful in 1933, has since had wide support in state and other courts despite some contrary opinion. The comment specifically cites these Ohio authorities in support of the rule: *Bryant* v. *Schrage* (1945), 75 Ohio App. 62; *Taylor* v. *Continental Casualty Co.* (1945), 75 Ohio App. 299, 43 Ohio, Law Abs. 178, m. c. o. May 16, 1945; and *Employer's Fire Ins. Co.* v. *United Parcel Service* (1950), 89 Ohio App. 447, 59 Ohio Law Abs. 561. None of them, however, dealt specifically with hospital cases,

Consequently, the court finds that the proposed renewal of the policy in issue here is clearly lawful and a writ of mandamus directing the county commissioners to pay the premium therefor is allowed.

*Judgment for plaintiffs.*